IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

CLUB TEXTING, INC. d/b/a
    EZ TEXTING, INC.,

                    Plaintiff,

      -- against --

T-MOBILE USA, INC.,

                    Defendant.

------------------------------------------------------------x

Case No. 10-CIV-7205 (PKC)

### DECLARATION OF VENETIA ESPINOZA-DAWSON

I, VENETIA ESPINOZA-DAWSON, declare as follows:

1. I am Director, Product Development Strategies and Content Acquisition for T-Mobile USA, Inc. ("T-Mobile"). I am responsible for T-Mobile's direct to consumer business, including T-Mobile's Content Gateway program for common "short code" provisioning, which permits content providers to send messages and services (such as ringtones, games, and wallpaper) to T-Mobile subscribers over T-Mobile's wireless network using various messaging technologies. I submit this declaration in support of T-Mobile's opposition to the motion of plaintiff Club Texting, Inc. d/b/a EZ Texting, Inc. ("EZ Texting") for a preliminary injunction in this action. I make this declaration based upon knowledge I have gained in the performance of my job and review of the relevant T-Mobile books and records.

2. I am personally familiar with T-Mobile's decision to terminate network access to a short code message campaign associated with EZ Texting for violation of the terms and conditions of T-Mobile's aggregator agreement, and the guidelines governing its program

for short code provisioning. As explained below, T-Mobile terminated network access when it learned that EZ Texting was using its short code to support and distribute an unauthorized messaging campaign that had not been submitted for approval by T-Mobile, an approval process that T-Mobile requires for all messaging campaigns and that the Mobile Marketing Association ("MMA"), a trade association comprised of mobile carriers, aggregators, and content providers, recommends as a "best practice" for all short code messaging services.

3. Although EZ Texting obtained approval from T-Mobile in 2009 to use its "313131" short code for a text messaging program designed to alert consumers about upcoming events at bars and clubs, T-Mobile subsequently learned that EZ Texting was using the same short code to promote a completely different service that T-Mobile had never reviewed or approved. Since the filing of this lawsuit, T-Mobile has learned that EZ Texting has violated T-Mobile's aggregator agreement and guidelines by using the same 313131 short code to promote many other different campaigns that have never been submitted for approval to T-Mobile.

**Short Codes and the MMA Consumer Best Practices Guidelines**

4. Short codes are unique five- or six-character phone numbers that wireless phone subscribers can use to send Short Message Service messages ("SMS," or "text messages") to various content providers to request and receive information services, such as sports scores, weather alerts, contest information, coupons, and other marketing and promotional content. A short code essentially functions as a mobile address for the content provider – much like a domain name or URL functions on the Internet – and enables the servers on a wireless carrier's network to identify and distribute messages to the holder of that unique short code.

5. Short codes in the United States are administered by the Common Short Code Administrator, CTIA – The Wireless Association ("CTIA"), which is an international organization representing the wireless industry on behalf of wireless carriers and manufacturers.

T-Mobile and other wireless carriers play no role in assigning short codes. A content provider may lease a short code from Neustar, which maintains a registry of short codes in the U.S. on behalf of the Common Short Code Administrator.

6. After obtaining a short code, however, a content provider must apply to obtain approval from individual carriers for the specific marketing program or campaign that will be associated with the short code before it can gain access to the carriers' networks and subscribers and launch the campaign. This process is employed by all of the wireless carriers and is recommended as a "best practice" by the MMA. The MMA has developed a series of recommended "best practices" regarding the submission, review, and approval or rejection of proposed short code marketing programs. The MMA guidelines for implementing short code programs, called the U.S. Consumer Best Practices Guidelines for Cross-Carrier Mobile Content Programs (June 2010) ("MMA Best Practices"), were intended to centralize and standardize the industry's best practices and business rules for the provision of mobile content services outside the carrier network (also known as "off-deck" or "off-portal" services). (*See* Ex. A hereto.) These practices also help protect the carriers' customers, businesses, and brands from offensive, abusive, fraudulent, or illegal information services that the carriers reasonably believe may pose such legal or other risks.

7. The MMA Best Practices recommend this approval process to ensure that carriers are able to determine whether short code messaging programs comply with many other best practices designed to protect consumers, such as guidelines providing for clear advertising to consumers generally, and limiting advertising to children specifically, and guidelines limiting viral marketing and requiring customer care and HELP services. (*See, e.g.*, Ex. A §§ 1.2-1.8.) For example, Section 1.2-4 of the MMA Best Practices states that any "reference to the abuse of

alcohol, drugs, tobacco or other controlled substances is strictly prohibited," and that this includes "verbal and non-verbal actions in which a person could conclude that promotion of drug use is intended." (Ex. A §1.2-4.)

8. T-Mobile and all of the other major U.S. wireless carriers have signed on to the MMA Guidelines and incorporate the Guidelines into their contracts with the mobile content aggregators. The aggregators agree to abide by the Guidelines and to ensure that their content provider customers also abide by the Guidelines.

9. Under the MMA Best Practices, short codes must be "approved and provisioned *based on the specific program that was presented to the aggregator and carrier.*" (Ex. A § 5.0-1 (emphasis added).) Those guidelines explicitly provide that any changes or modifications to an approved short code program also must be submitted for authorization to the carrier:

> If the content provider wishes to run new, modified, or additional programs on the shortcode, they should submit the additional program for approval to the aggregator/carrier.

(*Id.* § 5.0-2.) The MMA Best Practices specifically state that "changes and additions that should be submitted for carrier approval" include any "[m]aterial change in content" to an approved campaign. (*Id.* § 5.0-3.)

10. As further explained in the MMA's Short Code Primer, which outlines the process for seeking approval of a short code marketing campaign, the provider must implement the same campaign that is submitted to and approved by the carrier:

> The campaign must follow the program brief that was approved, as well as the MMA Consumer Best practices guidelines. The carrier will test each aspect of the program, including billing. Once this testing is complete, the program is considered "launched" and "live" on the network.

4

(Ex. B at 9 hereto.)   The Short Code Primer recognizes that carriers have discretion to reject or deny any program:

> Carriers have the right to accept or deny any campaign, hence the importance of clearly defining your campaign in detail. If it's not clearly defined and doesn't follow the MMA Best Practices Guidelines, it will be rejected, delaying your campaign. The application is reviewed for legal risks to the carrier because they're responsible for delivery to their customers.

(*Id.* at 6.)

**T-Mobile's Short Code Provisioning Program**

11.   To implement its short code provisioning program, T-Mobile enters into agreements with content aggregators that provide access to T-Mobile's network servers, billing system, and subscribers. The content aggregators typically broker that access by entering into contracts with sub-aggregators or multiple third-party content providers who seek to market short code services to T-Mobile's customers. Each short code campaign must be approved and provisioned by T-Mobile before aggregators and content providers can obtain access to T-Mobile's network and billing services, and begin to send and receive information services through SMS and MMS messages.

12.   The short code program approval process is governed by T-Mobile's aggregator agreements and related guidelines. T-Mobile's individual rules and standards for the approval process are based in large part on the MMA Best Practices described above.

13.   With respect to the services at issue in this action, T-Mobile entered into an agreement with OpenMarket Inc. ("OpenMarket") to serve as a primary content aggregator for T-Mobile's short code provisioning services. OpenMarket entered into an agreement with a sub-aggregator – 4INFO Inc. ("4INFO") – which in turn entered into an agreement with EZ Texting to access T-Mobile's network and billing platform. T-Mobile has no direct contractual

relationship with either 4INFO or EZ Texting. Nevertheless, aggregators are obligated under T-Mobile's rules and guidelines to ensure that sub-aggregators and third-party content providers comply with the MMA Best Practices, as well as T-Mobile's rules and guidelines themselves.

14. Under the short code provisioning program, OpenMarket has access to T-Mobile's network and billing system through various servers that distribute information services to T-Mobile subscribers. OpenMarket may provide such information services itself or may enter into binding, written agreements with third-party content providers – such as EZ Texting – to provide such information services, pursuant to the terms of the aggregator agreement and T-Mobile's guidelines.

15. As an aggregator, OpenMarket may not deliver any short code information services without T-Mobile's prior review and written approval of those services. Likewise, third-party providers are permitted to deliver only those information services that are described in the application submitted to and approved by T-Mobile.

16. Under the program, and as agreed to by the content aggregators, T-Mobile requires providers to submit a new program brief through the approval process before making any changes to an approved service. Likewise, if a short code service is discontinued, a content provider may not reassign the short code to a different service without first submitting a program brief for approval by T-Mobile.

17. T-Mobile's aggregator agreement and guidelines provide that failure to comply with the contract or guidelines may be grounds for suspending or disabling short code services. T-Mobile can suspend short code services or de-provision short codes used on its network where it reasonably believes the service will have an adverse impact on T-Mobile or the network, where any services fail to comply with the aggregator agreements, or where an

aggregator or third party provider breaches its obligations under such agreements or the guidelines.

18. Furthermore, because all new short code services, and all modifications to approved services, must be submitted for authorization by T-Mobile, failure to follow the approval process is considered a breach of the aggregator agreement.

**The Termination of Plaintiff's Unauthorized Short Code Program**

19. On or about September 10, 2010, T-Mobile terminated plaintiff's "313131" short code from the network when we determined that EZ Texting was using the code to promote a messaging campaign that had not been submitted for review and approval by T-Mobile. The new messaging campaign was different from the one short code program that T-Mobile had approved for plaintiff in 2009.

20. On or about July 20, 2009, plaintiff submitted a program brief through OpenMarket and 4INFO seeking T-Mobile's approval for an alerts program under its 313131 short code ("Program Brief"). (Ex. C hereto.) The program description stated that "EZ Texting Alerts is a cross carrier alerts service (10 msgs per month) designed to update consumers on events and happens [sic] at clubs and bars." (*Id.* at 2.) T-Mobile approved the application to provide alerts to update consumers on events and happenings at clubs and bars. EZ Texting was obligated to use the 313131 short code solely for the approved alerts program, and could not modify that program, or run new campaigns using the same short code, without obtaining prior written approval.

21. On or about September 10, 2010, however, T-Mobile received information from CTIA that plaintiff was running a campaign on the 313131 short code promoting a website, called WeedMaps.com, that provided information related to marijuana dispensaries in California and Colorado. (Ex. D hereto.) T-Mobile reviewed its records and confirmed that the only

7

Program Brief T-Mobile had approved for the 313131 short code related to EZ Texting's bar and club alert service. Plaintiff had never applied for nor obtained approval to use the 313131 short code with any new program, or to modify the old program, in connection with information services concerning marijuana dispensaries.

22. On this basis, T-Mobile concluded that EZ Texting was using the 313131 short code to promote an unauthorized "shadow program," in breach of the aggregator agreement, T-Mobile's guidelines, and the MMA Best Practices. Because EZ Texting had not obtained the requisite approval, T-Mobile unilaterally terminated the short code 313131 from its network.

23. Shortly thereafter, T-Mobile learned that EZ Texting had been promoting many other unauthorized "shadow programs" under the same code, without complying with its obligations to submit all new program applications for review and approval by T-Mobile. T-Mobile subsequently was contacted by an attorney named Scott Delacourt, who stated that he represented the holders of the 313131 short code. T-Mobile learned during this call that EZ Texting was operating a business platform that effectively permitted its customers to promote any content they wanted in connection with EZ Texting's 313131 short code messaging service.

24. Upon reviewing the EZ Texting website (*see* http://www.eztexting.com/index.php.), T-Mobile confirmed that plaintiff was advertising the availability of the 313131 short code to promote a range of programs having nothing to do with the original campaign approved for bar and club alerts. (*See* Ex. E hereto.) In addition to alerts for "bars and nightclubs," EZ Texting appears to be using the 313131 short code to promote marketing programs for, among others, religious groups, restaurants, event marketers, traditional

media, schools, social groups, real estate, and software developers. None of these programs has been submitted to or approved by T-Mobile.

25. The original website referenced in the program description in EZ Texting's Program Brief (Ex. C), similarly indicates that the alerts associated with the 313131 short code in fact are not limited to "events and happenings" at bars and clubs, as originally stated in the application, but are also available to update "consumers and members on events and happenings at various venues, schools, churches, etc." (Ex. F hereto.) Those alternative programs were never approved by T-Mobile.

26. I further note that in his affidavit, EZ Texting's Chief Executive Officer, Shane Neman, admits that, under EZ Texting's business model, "a party rental company may advertise to a potential customer to text 'Party' to 313131 to receive information about the rental services provided," while a "church customer likewise cold send its services schedule to a cell phone user who texted 'CHURCH' to 313131." (Neman Aff. ¶ 9.) T-Mobile has not approved programs relating to party rental services or church services for use under the 313131 short code. These shadow programs are also unauthorized. Accordingly, plaintiff's claim that it has terminated its unauthorized service relationship with the marijuana website (*id.* ¶¶ 24-25), does not resolve EZ Texting's ongoing practice of promoting multiple unauthorized campaigns through the 313131 short code.

27. Finally, I note that EZ Texting has refused T-Mobile's offer to reinstate the 313131 short code once EZ Texting submits all of the unauthorized shadow programs it has been running under the code for approval.

I declare under penalty of perjury that the foregoing is true and correct.

*Venetia Espinoza-Dawson*
9-22-10

Executed on September 22, 2010