IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                                   :

CLUB TEXTING, INC. d/b/a
       EZ TEXTING, INC.,                            :

                                         :

                    Plaintiff,          :

                                       :     Case No. 10-CIV-7205 (PKC)

           -- against --           :

                                       :

T-MOBILE USA, INC.,                :

                                       :

                   Defendant.      :

                                       :
----------------------------------------------------------------x

 

## DEFENDANT T-MOBILE USA, INC.'S
## MEMORANDUM OF LAW IN OPPOSITION TO
## <u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>

Alan M. Unger
John J. Lavelle
Corban S. Rhodes
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Counsel for Defendant T-Mobile USA, Inc.*

## TABLE OF CONTENTS

Preliminary Statement ..........................................................................................1

Background ..........................................................................................................4

    Short Codes and the MMA Best Practices ....................................................4

    T-Mobile's Short Code Provisioning Program and Guidelines.....................7

    T-Mobile's Relationship with EZ Texting and the  Termination of Plaintiff's
    Unauthorized Short Code Program ..............................................................8

Argument ...........................................................................................................11

A.    Plaintiff Can Establish No Threat Of Imminent Irreparable Harm .........11

B.    Plaintiff Can Demonstrate No Substantial Likelihood Of Success On The Merits Of
    Its Claims ....................................................................................................14

        1.    Plaintiff Has No Likelihood of Success on the Merits of its Federal
            Communications Act Claims Because Information Services Such As
            Short Code Provisioning Are Not Subject To Title II of the Act.........14

        2.    Plaintiff has No Likelihood of Prevailing on its Antitrust Claim Under
            Section 1 of the Sherman Act ................................................................19

        3.    Plaintiff Has No Likelihood of Success on its Claim for Tortious
            Interference with Contractual Relations ...............................................21

C.    The Balance of the Harms Weighs Decidedly in T-Mobile's Favor ............22

Conclusion ..........................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arbitron Co. v. Phoenix Broad. Corp.*,
  1997 WL 452020 (S.D.N.Y. Aug. 6, 1997)...........................................................................12

*AT&T Corp. v. F.C.C.*,
  317 F.3d 227 (D.C. Cir. 2003)...............................................................................................18

*Auto Sunroof, Inc. v. Am. Sunroof Corp.*,
  639 F. Supp. 1492 (S.D.N.Y. 1986)................................................................................22, 23

*Beal v. Stern*,
  184 F.3d 117 (2d Cir. 1999)....................................................................................................11

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*,
  996 F.2d 537 (2d Cir.), *cert. denied*, 510 U.S. 947 (1993).....................................................20

*Deployment of Wireline Services Offering Advanced Telecommunications Capability*,
  13 F.C.C.R. 24011 ...................................................................................................................16

*Detariffing of Billing and Collection Services*,
  102 F.C.C.2d 1150.............................................................................................................15, 18

*Doninger v. Niehoff*,
  527 F.3d 41 (2d Cir. 2008)................................................................................................11, 15

*Donohue v. Patterson*,
  2010 WL 2134140 (N.D.N.Y. May 12, 2010).........................................................................13

*Fox Ins. Co. v. Envision Pharma. Holdings, Inc.*,
  2009 WL 790312 (E.D.N.Y. Mar. 23, 2009)...........................................................................13

*Goldberg v. Cablevision Sys. Corp.*,
  193 F. Supp. 2d 588 (E.D.N.Y. 2002) ....................................................................................14

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007)......................................................................................................12

*Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the
  Communications Act of 1934*,
  11 F.C.C.R. 21905 (1996).......................................................................................................16

*Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*,
  No. 09 CV 5874 (RPP), 2010 WL 1948333 (S.D.N.Y. May 13, 2010) ..................................21

*Italverde Trading, Inc. v. Four Bills of Lading*,
    485 F. Supp. 2d 187 (E.D.N.Y. 2007) .................................................................21

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
    596 F.2d 70 (2d Cir. 1979).......................................................................12, 22

*Jackson v. Am. Plaza Corp.*,
    No. 08 Civ. 8980 (PKC), 2009 WL 1158829 (S.D.N.Y. Apr. 28, 2009) (Castel, J.) .............12

*Joan Hansen & Co., Inc. v. Everlast World's Boxing Headquarters Corp.*,
    296 A.D.2d 103, 744 N.Y.S.2d 384 (1st Dep't 2002)............................................22

*Joint Apprenticeship and Training Council Of Local 363, International Brotherhood of
    Teamsters v. N.Y. Dep't of Labor*, 829 F. Supp. 101 (S.D.N.Y. 1993) ...................................14

*Katel Ltd. Liability Co. v. AT & T Corp.*,
    607 F.3d 60 (2d Cir. 2010).......................................................................21

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)...............................................................................20

*Nat'l Comm'ns. Ass'n Inc. v. AT & T Corp.*,
    238 F.3d 124 (2d Cir. 2001)......................................................................19

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
    992 F.2d 430 (2d Cir. 1993)......................................................................13

*Northwestern Bell Tel. Co. Petition for Declaratory Ruling*,
    2 F.C.C.R. 5986 (1987)...........................................................................16

*Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services are
    Exempt from Access Charges*, 19 F.C.C.R. 7457 (2004)..................................16, 17

*Petition for Declaratory Ruling Under Section 64.702 of the Commission's Rules
    Regarding the Integration of Centrex, Enhanced Services, and Customer Premises
    Equipment*, 01 F.C.C.2d 349 (1985) .................................................................16

*Petition of the Verizon Telephone Companies for Waiver of Comparably Efficient
    Interconnection Requirements to Provide Reverse Directory Assistance*,
    17 F.C.C.R. 13881 (WCB 2002)...................................................................16

*Reiter's Beer Distribs., Inc. v. Christian Schmidt Brewing Co.*,
    1986 WL 13950 (E.D.N.Y. Sept. 9, 1986) ..........................................................13

*Rosa-Lino Bev. Distribs., Inc. v. Coca-Cola Bottling Co.*,
    749 F.2d 124 (2d Cir. 1984)......................................................................13

*Shepard Indus., Inc. v. 135 E. 57th St., LLC*,
  1999 WL 728641 (S.D.N.Y. Sept. 17, 1999) ........................................................13

*The Public Service Commission of Maryland and Maryland People's Counsel*
  *Applications for Review of a Memorandum Opinion and Order By the Chief,*
  *Common Carrier Bureau Denying The Public Service Commission of Maryland*
  *Petition for Declaratory Ruling Regarding Billing and Collection Services* .........................15

*The Public Utilities Commission of New Hampshire Petition for Rule Making Regarding*
  *Billing and Collection Services*, 4 F.C.C.R. 4000 .........................................................15, 18

**STATUTES**

15 U.S.C. § 1 .........................................................................................................20

47 U.S.C. § 153(43) ...............................................................................................16

Pub. L. No. 104-104, 110 Stat. 56 (1996) ..............................................................16

Sections 201 and 202(a) of the Federal Communications Act of 1934 ...................3, 15

**OTHER AUTHORITIES**

47 C.F.R. § 20.3 ....................................................................................................17

77 F.C.C.2d 384 ..............................................................................................17, 18

Defendant T-Mobile USA, Inc. ("T-Mobile") submits this memorandum of law in opposition to the motion of plaintiff Club Texting, Inc. d/b/a EZ Texting, Inc.'s ("EZ Texting") for a preliminary injunction.

## Preliminary Statement

T-Mobile's program for common "short code" provisioned services permits mobile content providers to transmit information services (including text messages, ringtones, games, wallpaper, and other content) over T-Mobile's wireless network to subscribers who, by using the provider's unique 5- or 6-digit "short code," are able to request and receive those services on their handsets.  In June 2009, T-Mobile approved plaintiff's application to use its "313131" short code to promote a specific text messaging campaign designed to alert subscribers about upcoming events and happenings at various bars and clubs.

As T-Mobile recently learned, however, plaintiff was using the 313131 short code to promote a completely different messaging campaign.  EZ Texting never submitted that new campaign for T-Mobile's prior review and approval, even though prior approval is required for all short code messaging campaigns provisioned by T-Mobile, and by every other carrier that provides such services, as recommended by the industry trade group, Mobile Marketing Association ("MMA").  On that basis, T-Mobile unilaterally decided to terminate network access for the 313131 short code due to EZ Text's violation of T-Mobile's agreements and guidelines governing the short code provisioning program.

Despite its lack of compliance with the program rules, EZ Texting now seeks a mandatory injunction that would compel T-Mobile to reinstate network access for the 313131 short code and continue all provisioning and billing services related to its campaigns, whether they have been approved by T-Mobile or not.  Plaintiff misleadingly suggests that T-Mobile decided to block its short code based solely on the content of the unauthorized campaign itself.

But in fact, plaintiff cannot dispute that T-Mobile's program guidelines require prior written approval for all new or modified messaging campaigns, and that it failed even to seek the required approval for its unauthorized "shadow campaign."

Furthermore, since the filing of this lawsuit, T-Mobile has learned that EZ Texting has been violating T-Mobile's short code guidelines for some time by using the same 313131 short code for many other campaigns that have not been approved by T-Mobile and have nothing whatsoever to do with the text alert campaign for bars and nightclubs, as originally authorized. Plaintiff's moving papers themselves disclose that EZ Texting markets campaigns where customers can receive information about "party rental services" by texting "'PARTY' to 313131," or information about "church service" schedules by texting "'CHURCH' to 313131." (Declaration of Shahriyar Neman ("Neman Decl.") ¶ 9.) EZ Texting never submitted their campaigns to run over the 313131 short code, and T-Mobile never approved these or any other campaigns to run on its network under short code 313131. T-Mobile's guidelines and the MMA's industry-wide best practices prohibit content providers such as plaintiff from using one short code, and a single authorized campaign as a mobile Trojan Horse to conceal the proliferation of numerous unauthorized shadow campaigns on T-Mobile's network.

Under these circumstances, plaintiff's motion should be denied under the heightened standard in this Circuit for obtaining a mandatory preliminary injunction. EZ Texting cannot demonstrate that it will suffer any imminent threat of irreparable harm because it concedes that T-Mobile is one of four major carriers constituting only 15% of the market for wireless subscribers, and can make no showing that the temporary loss of T-Mobile's customer base for one short code number will drive plaintiff out of business. Moreover, any harm suffered by plaintiff is the self-inflicted result of its failure to comply with T-Mobile's industry-wide and

long-standing approval process for short code campaigns, and could be repaired or minimized simply by properly submitting any programs it seeks to run on that short code to T-Mobile for approval.  And even if plaintiff were to suffer any actual harm resulting from the termination of its short code, money damages unquestionably would constitute an adequate remedy to compensate for any lost service fees from T-Mobile's customers.

EZ Texting similarly can establish no substantial likelihood of success on the merits for any of its claims for relief.  Plaintiff cannot prevail on either of its claims for violation of Sections 201 and 202(a) of the Federal Communications Act of 1934, as amended (the "Act" or "Communications Act"), because short code provisioning services constitute "information services," rather than telecommunications services, and as such are not subject to the common carrier provisions of Title II of the Communications Act.
T-Mobile therefore has discretion to require pre-approval for any short code marketing campaigns run on its network, and to enforce its guidelines by terminating programs for which a content provider failed to obtain the necessary approval.

But even if short code provisioning were found to be subject to common carrier regulation, plaintiff cannot demonstrate that T-Mobile's approval process and termination decision in this instance were unreasonable in any way.  It is undisputed that every carrier in the industry that provides short code services follows similar processes that are deemed to be "best practices" by the MMA in order to protect the carrier and its customers from potentially illegal, fraudulent, or offensive marketing campaigns conducted on its network.  Nor did T-Mobile discriminate in terminating plaintiff's short code:  T-Mobile would make the same decision with respect to any similarly situated content providers who failed to comply with T-Mobile's approval process for short code campaigns.

Plaintiff essentially abandons its conclusory claims for violation of the antitrust laws and tortious interference with contract by failing to address them in its moving brief, and for good reason.  Plaintiff cannot prevail on either claim where the evidence establishes that T-Mobile acted unilaterally and in its own self interest to terminate the short code based on plaintiff's breach of T-Mobile's guidelines.  For these reasons and those set forth below, plaintiff's motion for a mandatory injunction should be denied.

## Background

### Short Codes and the MMA Best Practices

Short codes are unique five- or six-character phone numbers that wireless phone subscribers can use to send Short Message Service messages ("SMS," or "text messages") to various content providers to request and receive information services, such as sports scores, weather alerts, contest information, coupons, and other marketing and promotional content. (Declaration of Venetia Espinoza-Dawson, sworn to on Sept. 22, 2010 ("Espinoza Decl.") ¶ 4.) Essentially, a short code functions as a mobile address for a content provider – like a domain name or URL functions on the Internet – and enables the servers on a wireless carrier's network to identify and distribute messages to the holder of that unique short code.  (*Id.*)  In the United States, short codes are administered by the Common Short Code Administrator, CTIA – The Wireless Association ("CTIA"), which is an international organization representing the wireless industry on behalf of wireless carriers and manufacturers.  (*Id.* ¶ 5.)  T-Mobile and other wireless carriers play no role in assigning short codes.  (*Id.*)

A content provider, like EZ Texting, may lease a short code from Neustar, which maintains a registry of short codes in the U.S. on behalf of the Common Short Code Administrator.  (*Id.*)  After obtaining a short code, a content provider must apply for approval from individual carriers for the specific marketing program or campaign that will be associated

4

with the short code before it can gain access to the carriers' networks and subscribers to launch the campaign.  (*Id.* ¶ 6.)  This process is uniformly employed by all wireless carriers and is recommended as a "best practice" by the MMA, a trade association comprised of mobile carriers, aggregators, and content providers, which has developed a series of recommended "best practices" regarding the submission, review, and approval or rejection of proposed short code marketing programs.  (*Id.* ¶¶ 2, 6.)  The MMA guidelines for implementing short code programs, called the U.S. Consumer Best Practices Guidelines for Cross-Carrier Mobile Content Programs ("MMA Best Practices"), were intended to centralize and standardize the industry's best practices and business rules for the provision of mobile content services outside the carrier network (also known as "off-deck" or "off-portal" services).  (*Id.* ¶ 6; *see also id.* Ex. A.)

The MMA Best Practices recommend implementation of an approval process to protect the carriers' customers, businesses, and brands from offensive, abusive, fraudulent, or illegal information services.  Requiring content providers to obtain pre-approval for their programs ensures that carriers are able to determine before a marketing campaign is launched that it will comply with other best practices designed to protect consumers, such as guidelines providing for clear advertising to consumers generally, and limiting advertising to children specifically, and guidelines limiting viral marketing and requiring customer care and HELP services.  (*See id.* ¶ 7; *id.* Ex. A §§ 1.2-1.8.)  Section 1.2-4 of the MMA Best Practices, for example, states that any "reference to the abuse of alcohol, drugs, tobacco or other controlled substances is strictly prohibited," and that this includes "verbal and non-verbal actions in which a person could conclude that promotion of drug use is intended."  (*Id.* Ex. A §1.2-4.)

T-Mobile, like all of the other major U.S. wireless carriers, has adopted the MMA Best Practices and incorporated the MMA Best Practices into its contracts with mobile content

aggregators.  (Espinoza Decl. ¶ 8.)  The aggregators by contract agree to abide by the MMA Best

Practices and to ensure that their content provider customers also abide by the them.  (*Id.*)  Under

the MMA Best Practices, short codes must be "approved and provisioned *based on the specific*

*program that was presented to the aggregator and carrier*."  (*Id.* Ex. A § 5.0-1 (emphasis

added).)  And the guidelines expressly provide that any changes or modifications to an approved

short code program also must be submitted for authorization to the carrier:

> If the content provider wishes to run new, modified, or additional
> programs on the shortcode, they should submit the additional
> program for approval to the aggregator/carrier.

(*Id.* § 5.0-2.)  The MMA Best Practices also expressly provides that "changes and additions that

should be submitted for carrier approval" include any "[m]aterial change in content" to an

approved campaign.  (*Id.* § 5.0-3.)  As further explained in the MMA's Short Code Primer,

which outlines the process for seeking approval of a short code marketing campaign, the content

provider must implement the same campaign that is submitted to and approved by the carrier:

> The campaign must follow the program brief that was approved, as
> well as the MMA Consumer Best practices guidelines.  The carrier
> will test each aspect of the program, including billing.  Once this
> testing is complete, the program is considered "launched" and
> "live" on the network.

(*Id.* Ex. B at 9.)  The Short Code Primer, a document provided to content providers like EZ

Texting, also expressly provides that carriers have discretion to reject or deny any program:

> Carriers have the right to accept or deny any campaign, hence the
> importance of clearly defining your campaign in detail.  If it's not
> clearly defined and doesn't follow the MMA Best Practices
> Guidelines, it will be rejected, delaying your campaign.  The
> application is reviewed for legal risks to the carrier because they're
> responsible for delivery to their customers.

(*Id.* at 6.)

**T-Mobile's Short Code Provisioning Program and Guidelines**

T-Mobile enters into agreements with content aggregators that provide access to T-Mobile's network servers, billing system, and subscribers to implement its short code provisioning program. (Espinoza Decl. ¶ 11.) Content aggregators typically broker that access by entering into contracts with sub-aggregators or multiple third-party content providers who seek to market short code services to T-Mobile's customers. (*Id.*) Every short code campaign must be approved and provisioned by T-Mobile before aggregators and content providers can obtain access to T-Mobile's network and billing services, and begin to send and receive information services through SMS and MMS messages. (*Id.*) The short code program approval process is governed by T-Mobile's aggregator agreements and T-Mobile's individual rules, requirements, and standards for the approval process (which are based in large part on the MMA Best Practices described above). (*Id.* ¶ 12.)

With respect to EZ Texting's services, T-Mobile entered into an agreement with OpenMarket Inc. ("OpenMarket") to serve as a primary content aggregator for T-Mobile's short code provisioning services. (*Id.* ¶ 13.) In turn, OpenMarket entered into an agreement with a sub-aggregator – 4INFO Inc. ("4INFO") – which then entered into an agreement with EZ Texting to access T-Mobile's network and billing platform. (*Id.*) T-Mobile has no direct contractual relationship with either 4INFO or EZ Texting. (*Id.*) However, aggregators are obligated under T-Mobile's rules and guidelines to ensure that sub-aggregators and third-party content providers, such as EZ Texting, comply with the MMA Best Practices, as well as T-Mobile's rules and guidelines. (*Id.*)

Under the short code provisioning program, OpenMarket has access to T-Mobile's network and billing system through various servers that distribute information services to T-Mobile subscribers. (*Id.* ¶ 14.) OpenMarket may provide such information services itself or

may enter into binding, written agreements with third-party content providers – such as EZ Texting – to provide such information services, but any and all of these arrangements must be consistent with the terms of the aggregator agreement and T-Mobile's guidelines.  (*Id.*)

OpenMarket and other aggregators may not deliver any short code information services without T-Mobile's prior review and written approval of those services.  (*Id.* ¶ 15.) Additionally, third-party providers are permitted to deliver only those information services that are described in the application submitted to and approved by T-Mobile.  (*Id.*)  And if a short code service is discontinued, a content provider may not reassign the short code to a different service without first submitting a program brief for approval by T-Mobile.  (*Id.* ¶ 16.)

T-Mobile's aggregator agreement and guidelines provide that failure to comply with the contract or guidelines may be grounds for suspending or disabling short code services.  (*Id.* ¶ 17.)  T-Mobile can suspend short code services or de-provision short codes used on its network where it reasonably believes the service will have an adverse impact on T-Mobile or the network, where any services fail to comply with the aggregator agreements, or where an aggregator or third-party provider breaches its obligations under such agreements or the guidelines.  (*Id.*) Furthermore, because all new short code services, and all modifications to approved services, must be submitted for authorization by T-Mobile, failure to follow the approval process is considered a breach of the aggregator agreement.  (*Id.* ¶ 18.)  T-Mobile's policy is to terminate short codes if it determines that the content provider failed to comply.  (*Id.* ¶ 17.)

**T-Mobile's Relationship with EZ Texting and the**
**Termination of Plaintiff's Unauthorized Short Code Program**

EZ Texting obtained approval from T-Mobile in 2009 to use its 313131 short code for a text messaging program designed to alert consumers about upcoming events at bars and clubs.  (Espinoza Decl. ¶ 3.)  On July 20, 2009, plaintiff submitted a program brief through

OpenMarket and 4INFO seeking T-Mobile's approval for an alerts program under its 313131 short code ("Program Brief").  (*Id.* ¶ 20; *id.* Ex. C.)  The program description stated that "EZ Texting Alerts is a cross carrier alerts service (10 msgs per month) designed to update consumers on events and happens [*sic*] at clubs and bars."  (*Id.* Ex. C at 2.)   T-Mobile approved the application to provide alerts to update consumers on events and happenings at clubs and bars.  (Espinoza Decl. ¶ 20.)  EZ Texting was obligated to use the 313131 short code solely for the approved alerts program, and could not modify that program, or run new campaigns using the same short code, without obtaining prior written approval.  (*Id.*)

On or about September 10, 2010, T-Mobile received information from CTIA that plaintiff was running a campaign on the 313131 short code promoting a website, called WeedMaps.com, that provided information related to marijuana distribution in California and Colorado.  (*Id.* ¶ 21; *id.* Ex. D.)  T-Mobile reviewed its records and confirmed that the only program brief T-Mobile had approved for the 313131 short code related to EZ Texting's bar and club alert service.  (Espinoza Decl. ¶ 21.)  EZ Texting never applied for nor obtained approval to use the 313131 short code with any new program, or to modify the old program, in connection with information services concerning marijuana dispensaries.  (*Id.*)  Accordingly, T-Mobile concluded that EZ Texting was using the 313131 short code to promote an unauthorized "shadow program," in breach of the aggregator agreement, T-Mobile's guidelines, and the MMA Best Practices.  (*Id.* ¶ 24.)  Because plaintiff failed to obtain the requisite approval, T-Mobile terminated the short code 313131 from its network.  (*Id.*)

Shortly thereafter, T-Mobile learned that EZ Texting had been promoting many other unauthorized "shadow programs" under the same code, all without complying with its obligations to submit all new program applications for review and approval by T-Mobile.  (*Id.*

9

¶ 23.)  T-Mobile subsequently was contacted by an attorney named Scott Delacourt, who stated that he represented the holders of the 313131 short code.  (*Id.*)  During this call T-Mobile learned that EZ Texting has operated a business platform that permitted its customers to promote any content they wanted in connection with EZ Texting's 313131 short code messaging service, all without having obtained T-Mobile's approval.  (*Id.*)

Indeed, EZ Texting's website (*see* http://www.eztexting.com/index.php), shows that plaintiff has advertised the availability of the 313131 short code to promote a range of programs having nothing to do with the original campaign approved for bar and club alerts.  (*See id.* Ex. E.)  Thus, in addition to alerts for "bars and nightclubs," the only approved use for the short code, EZ Texting appears to be using the 313131 short code to promote marketing programs for, among others, religious groups, restaurants, event marketers, traditional media, schools, social groups, real estate, and software developers.[1]  (Espinoza Decl. ¶ 24.)   None of these programs were submitted to or approved by T-Mobile, and none were described in the original Program Brief.[2]  (*Id.*)

Notwithstanding EZ Texting's multiple admitted violations of T-Mobile's guidelines and the MMA Best Practices, T-Mobile offered EZ Texting the chance to have its 313131 short code reinstated, provided that EZ Texting would submit Program Briefs for the

---

[1] Indeed, Plaintiff's own affidavit admits that under EZ Texting's business model, "a party rental company may advertise to a potential customer to text 'Party' to 313131 to receive information about the rental services provided," while a "church customer likewise cold send its services schedule to a cell phone user who texted 'CHURCH' to 313131." (Neman Decl. ¶ 9.)  T-Mobile has not approved programs relating to party rental services or church services for use under the 313131 short code.  (Espinoza Decl. ¶ 26.)  These shadow programs are also unauthorized.  (*Id.*)  Thus, plaintiff's claim that it has terminated its unauthorized service relationship with the marijuana website (Neman Decl. ¶¶ 24-25), does not resolve EZ Texting's ongoing practice of promoting multiple unauthorized campaigns through the 313131 short code.  (Espinoza Decl. ¶ 26.)

[2] The original website referenced in the program description in EZ Texting's Program Brief (Espinoza Decl. Ex. C), now indicates that the alerts associated with the 313131 short code in fact are not limited to "events and happenings" at bars and clubs, as originally stated in the application, but are also available to update "consumers and members on events and happenings at various venues, schools, churches, etc."  (*Id.* ¶ 25; *id.* Ex. C at 2.)  Those alternative programs were never approved by T-Mobile.  (*Id.* ¶ 25.)

unauthorized shadow programs.  (*Id.* ¶ 27.)  EZ Texting has admitted that this process would

take only "approximately six months" to complete.  (*See* Neman Decl. ¶ 35.)  Despite the limited

time period required, and the fact that submission of those program briefs is required under T-

Mobile's guidelines and the MMA Best Practices, to date EZ Texting has refused to do so.

(Espinoza Decl. ¶ 27.)  Significantly, EZ Texting does not even allege (because it cannot) that it

has complied with the aggregator agreement, T-Mobile's guidelines, and the MMA Best

Practices.

<u>**Argument**</u>

**PLAINTIFF'S MOTION FOR A MANDATORY<br>**<u>**PRELIMINARY INJUNCTION SHOULD BE DENIED**</u>

The "party seeking a preliminary injunction ordinarily must show:  (1) a

likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of

success on the merits or sufficiently serious questions going to the merits to make them a fair

ground for litigation, with a balance of hardships tipping decidedly in the movant's favor."

*Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008).  Where the movant seeks a mandatory

injunction, a "more rigorous standard" applies and requires "a 'clear' or 'substantial' likelihood

of success on the merits."  *Id.* at 47.  An injunction is mandatory where, as here, the relief sought

"would 'change the positions of the parties as it existed prior to the grant.'"  *Beal v. Stern*, 184

F.3d 117, 123 (2d Cir. 1999) (citation omitted).

**A.      Plaintiff Can Establish No Threat Of Imminent Irreparable Harm**

A showing of irreparable harm is "'the single most important prerequisite for issuance of

a preliminary injunction.'"  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66-67

(2d Cir. 2007) (citation omitted).  Plaintiff claims that T-Mobile has caused it to suffer

irreparable harm by "foreclosing T-Mobile's customers" from using its services and that, absent

an injunction, it will not only suffer the "loss of good will," but its "entire business will fail" without access to "one of the nation's largest wireless service providers."  (Pl. Mem. at 7-8.)

EZ Texting can show no irreparable harm for the fundamental reason that any injury caused by T-Mobile's termination of the 313131 short code can be remedied through an award of monetary damages to compensate for any lost revenues from plaintiff's T-Mobile customers. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72-73 (2d Cir. 1979); *Jackson v. Am. Plaza Corp.*, No. 08 Civ. 8980 (PKC), 2009 WL 1158829, at *2, 6 (S.D.N.Y. Apr. 28, 2009) (Castel, J.) ("[P]laintiffs have not shown that a monetary award will be inadequate to compensate them if they ultimately prevail.").

Plaintiff also cannot establish irreparable harm based on its unsubstantiated claim that its "entire business will fail" absent injunctive relief.  Courts in this district recognize that lost business may rise to the level of irreparable harm only where the movant is "(1) threatened with the loss of an entire business," or "(2) threatened with the loss of a relatively unique product." *Arbitron Co. v. Phoenix Broad. Corp.*, 1997 WL 452020, at *4 (S.D.N.Y. Aug. 6, 1997).  Here, plaintiff concedes that T-Mobile is not "unique" but rather one of one of four major carriers with an approximately 15% share of the market.[3]  (Pl. Mem. at 7.)  Plaintiff cannot establish that the loss of T-Mobile's customer base for only one short code will drive it out of business because it effectively concedes that it still retains access to 85% of the potential market.[4]  In any event,

---

[3] Plaintiff further concedes on its own website that it has the ability to transmit traffic through "every cellular provider in the United States (including Alaska, & Hawaii) and Canada."  (*See* Declaration of Alan M. Unger ("Unger Decl." Ex. A) (identifying 53 carriers, other than T-Mobile, in U. S. and 10 carriers in Canada with whom EZ Texting does business).)

[4] *See, e.g., Reiter's Beer Distribs., Inc. v. Christian Schmidt Brewing Co.*, 1986 WL 13950, at *11 (E.D.N.Y. Sept. 9, 1986) (no irreparable harm where lost sales represented 17 to 29 percent of distributor's total sales).

plaintiff provides absolutely no data concerning the volume or overall percentage of its revenue lost from T-Mobile customers to substantiate any allegation of imminent business failure.[5]

Plaintiff's unsupported statement that T-Mobile has caused it to suffer the loss of good will[6] likewise is insufficient to establish irreparable harm. *See, e.g., Shepard Indus., Inc. v. 135 E. 57th St., LLC*, 1999 WL 728641, at *8 (S.D.N.Y. Sept. 17, 1999) ("conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm"). Although plaintiff also speculates that its current customers "will *likely* cease doing business with EZ Texting," and that prospective customers "are highly *unlikely* to engage EZ Texting" (Pl. Mem. at 8-9 (emphasis added)), the "'mere possibility of irreparable harm is insufficient to justify the drastic relief of a preliminary injunction.'" *Fox Ins. Co. v. Envision Pharma. Holdings, Inc.*, 2009 WL 790312, at *6, 8 (E.D.N.Y. Mar. 23, 2009) (finding no irreparable harm based on possibility that customers "*may* cease doing business," and that "*if* that occurred, [movant] would *likely* fail").

Finally, the law is clear that a party cannot establish irreparable harm where, as here, any alleged injury was entirely self-inflicted as a result of that party's failure to honor its own contractual obligations. *See Goldberg v. Cablevision Sys. Corp.*, 193 F. Supp. 2d 588, 599-600 (E.D.N.Y. 2002) (no irreparable harm where alleged injury was "self-inflicted" and caused by plaintiff's failure "to submit a signed and unaltered contract"). In addition to the self-inflicted

---

[5] The cases on which plaintiff relies are therefore inapposite because they involve unique products or concrete risk of a total business failure. *See Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993) (granting specific performance based on clear contractual right to block other dealerships from entering its area and proof of actual loss of customers resulting from new franchises); *Rosa-Lino Bev. Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (loss of soda distributorship). The decision in *Donohue v. Patterson*, 2010 WL 2134140, at *3 (N.D.N.Y. May 12, 2010), is particularly inapposite because it notes that irreparable harm "is often presumed where a constitutional injury is at stake."

[6] Plaintiff's claim that its reputation will be harmed if its customers "learn that EZ Texting is blocked by T-Mobile," (Pl. Mem. at 9), is particularly unpersuasive given that plaintiff's own Chief Executive Officer (and its affiant in support this motion for an injunction), has self-published details about this lawsuit on his Twitter account. (*See* Unger Decl. Ex. B.)

nature of plaintiff's failure to obtain approval for the terminated short code campaign,[7] plaintiff

continues to prolong its alleged injury by refusing T-Mobile's offer to reinstate the short code

upon compliance with the approval process for all outstanding, unauthorized programs.  *See*

*Joint Apprenticeship and Training Council Of Local 363, International Brotherhood of*

*Teamsters v. N.Y. Dep't of Labor*, 829 F. Supp. 101, 105 (S.D.N.Y. 1993) (no irreparable harm

because "plaintiff's so called irreparable injury amounts to no more than a pecuniary loss

resulting from its deprivation of financial benefits otherwise available to it as a registered

sponsor," and "plaintiff ha[d] the capacity at any time to obviate any injury by taking appropriate

action sufficient to restore it to active status").  Indeed, plaintiff admits that it could regain access

to T-Mobile's services in "approximately six months," such that any purported  "irreparable"

harm reasonably could be obviated before any trial in this action.   (Neman Decl. ¶ 35.)

> **B.     Plaintiff Can Demonstrate No Substantial Likelihood Of Success On The Merits Of Its Claims**

To obtain a mandatory injunction, plaintiff must demonstrate "a 'clear' or 'substantial'

likelihood of success on the merits."  *Doninger*, 527 F.3d at 47.  Plaintiff cannot prevail on any

of its claims under this more rigorous standard.

> **1.     Plaintiff Has No Likelihood of Success on the Merits of its Federal Communications Act Claims Because Information Services Such As Short Code Provisioning Are Not Subject To Title II of the Act**

Under the Communications Act, short code provisioning constitutes "information

services," rather than "telecommunications services," and as such are exempt from regulation

under the common carrier provisions of Title II of the Act.  The Federal Communications

Commission ("FCC") similarly has held that third-party billing and collection services – which

---

[7] Not surprisingly, plaintiff reserves the right under its own agreement to "suspend, terminate and/or cancel" service to any of its own customers for any "breach" of EZ Texting's standard terms and conditions, or "for any reason we may deem necessary to continue to provide our Service."  (*See* Unger Aff. Ex. C [http://www.eztexting.com/tou.html].)

T-Mobile performs in connection with short code provisioning for content providers – are "not subject to common carrier regulation under Title II."[8]  Accordingly, plaintiff can demonstrate no substantial likelihood of success on its claims for unlawful blocking and discrimination under Sections 201 and 202(a) of the Act, because those provisions do not apply to the information and billing services at issue in T-Mobile's short code provisioning program.[9]

Even if Title II did apply, however, plaintiff could not prevail on these claims because T-Mobile was entirely justified in terminating plaintiff's short code for non-compliance with the approval process for short code campaigns, and T-Mobile did not treat plaintiff any differently than it would have treated any other similarly situated, non-compliant provider.

Title II applies only to common carriers, and only when they are engaged in the provision of "telecommunications services," not "information services."[10]  "Telecommunications services" provide the means for individuals to communicate with each other "without change in form or content."  47 U.S.C. § 153(43).  By contrast "information services" such as short codes, "offer … a capability for … acquiring, storing, transforming, processing, retrieving, utilizing or making

---

[8] *The Public Service Commission of Maryland and Maryland People's Counsel Applications for Review of a Memorandum Opinion and Order By the Chief, Common Carrier Bureau Denying The Public Service Commission of Maryland Petition for Declaratory Ruling Regarding Billing and Collection Services; The Public Utilities Commission of New Hampshire Petition for Rule Making Regarding Billing and Collection Services*, 4 F.C.C.R. 4000 ¶ 6 (1989), *aff'd sub nom. Public Service Commission of Maryland v. FCC*, 909 F.2d 1510 (D.C. Cir. 1990) ("*Public Service Commission of Maryland*"); s*ee also Detariffing of Billing and Collection Services*, 102 F.C.C.2d 1150, 1152 ¶ 1 n.2, 1168-69 ¶¶ 32-33 (1986).

[9] Even if T-Mobile were to terminate a program based on content, it has the contractual right and discretion to do so under the aggregator agreement, its individual guidelines, and the MMA Best Practices.

[10] *See Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services are Exempt from Access Charges*, 19 F.C.C.R. 7457, 7459 ¶ 4 (2004) ("[T]he Commission declined to treat providers of enhanced services as common carriers subject to regulation under Title II of the Communications Act of 1934").  "Under the 1996 Act, any service with a communications component must be either a 'telecommunications service' or an 'information service' (but not both)."  *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, 13 F.C.C.R. 24011, 24029 ¶ 34 n.50 (1998).  The FCC has determined that "the differently-worded definitions of 'information services' and 'enhanced services' . . . should be interpreted to extend to the same functions." *Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934*, 11 F.C.C.R. 21905, 21955-56 ¶ 102 (1996) (subsequent history omitted).

available information via telecommunications."  Pub. L. No. 104-104, 110 Stat. 56 (1996).

Telecommunications services only encompass basic services such as person to person telephone

calls, whereas information services (or "enhanced services") can encompass a wide variety of

services, such as voicemails or directory assisted calling.[11]

As discussed in the accompanying Espinoza Declaration, short codes essentially function

as a mobile address for a content provider, in the same way that a domain name is an internet

address.  (Espinoza Decl. ¶ 4.)  The user sends information (a text message) to the short code

address, which is routed over the carriers' network through a series of computer servers until it is

delivered to the provider's server.  The software employed by the provider's computer acts

according to the code it receives (*e.g.,* counts a vote or retrieves information to be delivered to

the mobile subscriber), and relays a response to the subscriber.

This relay process provides for communication only to and from the marketer's

computer, and therefore does not "give[] subscribers the capability to communicate to or receive

communication from all other users on the public switched network," which is one of the

hallmarks of a basic cellular phone call service, also known as a "commercial mobile radio

service."  *See* 47 C.F.R. § 20.3.  As this process shows, short codes are highly complex,

enhanced information services, and not at all akin to "telecommunications services" for purposes

of the common-carrier regulations.  The FCC uses several criteria that illustrate that short code

messaging is not a telecommunications service governed by Title II.

---

[11] *See, e.g.*, *North American Telecommunications Association; Petition for Declaratory Ruling Under Section 64.702 of the Commission's Rules Regarding the Integration of Centrex, Enhanced Services, and Customer Premises Equipment*, 01 F.C.C.2d 349, 361 ¶ 27 (1985)  (voice mail); *see also Northwestern Bell Tel. Co. Petition for Declaratory Ruling*, 2 F.C.C.R. 5986, 5988 ¶ 20 (1987) ("Talking Yellow Pages" service); *BellSouth Petition for Waiver of the Computer III Comparably Efficient Interconnection Requirements; Petition of the Verizon Telephone Companies for Waiver of Comparably Efficient Interconnection Requirements to Provide Reverse Directory Assistance*, 17 F.C.C.R. 13881, 13884 ¶ 5 (WCB 2002) (electronic and operator-assisted reverse directory services).

First, FCC precedent is clear that services which entail "protocol conversion" are enhanced services: "[G]enerally, services that result in a protocol conversion are enhanced services, while services that result in no net protocol conversion to the end user are basic services."[12]  This essentially asks whether the information is being converted , or translated, into a different format during the course of transmission.  With short code transmissions, the information must be converted at least twice in order for the mobile device to communicate with the marketer's computer software and vice versa, and the services thus constitute information services or "enhanced services."   Short code provisioning thus provides a user with "a capability for" relying on protocol processing functionality, or message translation, that is not a hallmark of telecommunications service.

Second, the FCC has stated that communications services that allow the user to store and retrieve information are information services, not communication services.[13]  The storage and retrieval capabilities of short code marketing apply not only to the text messages themselves, but to a wide array of products and information, such as sports scores that a user might retrieve or a ringtone the user might download.  The FCC has long held that this type of user interaction with stored data is a *sine qua non* of information services.  *See supra*, n.11.

Third, the FCC has held that billing and collection services are "not subject to common carrier regulation under Title II."[14]  These services have a purely administrative function which highlights the true nature of short code messaging – an enhanced service that carriers offer to

---

[12] *Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services are Exempt from Access Charges*, 19 F.C.C.R. 7457, 7459 ¶ 4 (2004); *see also Amendment of Section 64.702 of the Commission's Rules and Regulations* (Second Computer Inquiry), 77 F.C.C.2d 384, 420-21 ¶ 97 (1980) (subsequent history omitted) ("Computer II Order").

[13] *Id.*

[14] *Public Service Commission of Maryland*, 4 F.C.C.R. 4000 ¶ 6; *see also Detariffing of Billing and Collection Services*, 102 F.C.C.2d 1150, 1152 ¶ 1 n.2, 1168-69 ¶¶ 32-33 (1986).

marketers to enable them to streamline their costs and communicate efficiently, *not* as a basic means of communication that would constitute common carrier services.

Each aspect of the short code messaging process demonstrates that it is not a basic telecommunications service, but rather a marketing tool with enhanced functionality of the kind that the FCC has repeatedly made clear are not subject to the special requirements set forth in Title II of the Act.  For these reasons, plaintiff cannot prevail on its Communications Act claims.

Even if Title II did apply to the provision of short codes by carriers, T-Mobile would have been well within its rights under Section 201 under these circumstances to terminate EZ Texting's short code.  Section 201 does not prevent a carrier from denying or terminating service, but rather imposes a reasonableness requirement upon any decision to deny such services.  *See AT&T Corp. v. F.C.C.*, 317 F.3d 227 (D.C. Cir. 2003) ("The inclusion of that term ["reasonable"] in the statute implies that a common carrier may lawfully deny service to a customer in some circumstances, whatever its effect upon universal service. The question is, were there here such circumstances . . .").

As discussed above, T-Mobile's termination decision was entirely justified and reasonable under its short code guidelines and the industry-wide practices reflected in the MMA Best Practices.  Under the MMA guidelines, short codes must be "approved and provisioned based on the specific program that was presented to the aggregator and carrier," and "changes and additions that should be submitted for carrier approval" include any "[m]aterial change in content."   (Espinoza Decl. ¶¶ 8-9.)  Significantly, EZ Texting advises its customers about the importance of following the MMA Guidelines and recognizes that carriers, such as T-Mobile, have the right to reject parties who fail to comply with the MMA Guidelines.[15]

---

[15] In a "straightforward white paper" created by EZ Texting to "explain the in's and out's of dedicated short codes," plaintiff advises customers that they must submit a "Service Approval Form" for short code campaign approvals,

Likewise, plaintiff would have no likelihood of success on its discrimination claims even if Section 202 of the Act were to apply to short code messaging.  The Second Circuit has stated that "a § 202(a) claim consists of three elements: (1) whether the services are "like"; (2) if so, whether the services were provided under different terms or conditions; and (3) whether any such difference was reasonable."  *Nat'l Comm'ns. Ass'n Inc. v. AT & T Corp.*, 238 F.3d 124, 127 (2d Cir. 2001).

As an initial matter, plaintiff has no basis for its assertion that "T-Mobile has not subjected any other mobile marketing company to . . . [the review and approval] process." (Compl. ¶ 6.)  In fact, T-Mobile requires *all* of its mobile marketing partners to participate in the exact same review and approval process, just as virtually all wireless carriers do.  (Espinoza Decl. ¶¶ 7-8, 11.)  T-Mobile responded to EZ Texting's non-compliance in the same manner that it treats such non-compliance by similarly situated providers: it terminated service to the short code.  (*Id.* Decl. ¶¶ 17, 22.)  Plaintiff thus could not prevail on its discrimination claim.

## 2.     Plaintiff has No Likelihood of Prevailing on its Antitrust Claim Under Section 1 of the Sherman Act

In its moving brief, plaintiff does not even address its perfunctory antitrust claim.  That is unsurprising because there is no possibility that plaintiff could establish that T-Mobile somehow "coerced an agreement in unreasonable restraint of trade" by forcing plaintiff's aggregator, OpenMarket, to "refuse to connect EZ Texting to the T-Mobile network."  (Compl. ¶ 59.)  As demonstrated in the accompanying Espinoza Declaration, T-Mobile in fact acted unilaterally in terminating plaintiff's short code.  (Espinoza Decl. ¶ 22.)  There was no involvement by or

---

and notes that carriers like T-Mobile "*all reserve the right to deny your application,*" and that, when a program is "denied *it is typically because it did not conform to Mobile Marketing Association guidelines.*"  (Unger Decl. Ex. D) Thus, plaintiff's own promotional website recognizes that T-Mobile had the right to terminate customers who failed to follow the MMA Guidelines.

agreement with OpenMarket in cutting off the code that could conceivably support a viable Section 1 claim.

It is well settled that "[i]ndependent action is not proscribed" under Section 1 of the Sherman Act. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). Section 1 renders illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. "Unilateral conduct on the part of a single person or enterprise falls outside the purview of this provision in the antitrust law." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 542 (2d Cir.), *cert. denied*, 510 U.S. 947 (1993).

T-Mobile's unilateral action therefore precludes a showing by EZ Texting that T-Mobile and OpenMarket entered into a "coercive agreement" in restraint of trade for the pursuant to which OpenMarket blocked transmission of plaintiff's service to T-Mobile's network. Plaintiff cannot produce any evidence to refute that T-Mobile acted independently to enforce its agreement and guidelines for its short code provisioning program. Indeed, plaintiff fails to allege any plausible theory of why T-Mobile would need to "coerce" and agreement from OpenMarket when it had the means to act unilaterally to enforce its guidelines by terminating the short code, let alone allege any plausible theory of a relevant product market, or any effects on market-wide competition as a result of such an agreement. *See Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, No. 09 CV 5874 (RPP), 2010 WL 1948333, at *9 (S.D.N.Y. May 13, 2010) ("even at the pleading stage, a plaintiff must state enough facts to *plausibly* suggest agreement, and factual allegations that *possibly* suggest agreement or are merely *consistent with* agreement are insufficient").

### 3.     Plaintiff Has No Likelihood of Success on its Claim for Tortious Interference with Contractual Relations

Plaintiff's brief also fails to address the claim for interference with contractual relations. To prevail on such a claim requires proof of "the existence of a valid contract between plaintiff and a third party, the defendant's intentional and unjustified procurement of the third party's breach of the contract, the actual breach of the contract[,] and the resulting damages." *Katel Ltd. Liability Co. v. AT & T Corp.*, 607 F.3d 60, 66 (2d Cir. 2010) (granting summary judgment to domestic carrier against international carrier's claims of, *inter alia*, tortious interference with contractual relations).   Plaintiff is unlikely to succeed on this claim because the complaint itself fails to allege the basic elements of an actual breach of a third-party contract, or that T-Mobile intentionally and unjustifiably procured the breach of such a contract by a third party.   *See id.*; *Italverde Trading, Inc. v. Four Bills of Lading*, 485 F. Supp. 2d 187, 201-02 (E.D.N.Y. 2007).

Even if the Complaint had stated a proper claim, plaintiff has no likelihood of success because T-Mobile had clear economic self-justifications for its decision to terminate plaintiff's short code. *See Joan Hansen & Co., Inc. v. Everlast World's Boxing Headquarters Corp.*, 296 A.D.2d 103, 107, 744 N.Y.S.2d 384, 388 (1st Dep't 2002) ("even if plaintiff could make out a breach of contract by Boxing, the complaint fails to allege why the termination of Boxing's contractual obligation to plaintiff is without economic justification.").   T-Mobile was fully justified in terminating a content provider that breached its obligations under the short code provisioning program and guidelines.   T-Mobile has a clear economic justification for preventing unauthorized shadow programs on its network, and the MMA Best Practices expressly prohibit such practices.  (Espinoza Decl. ¶ 7-8.)  Moreover, the approval process itself furthers T-Mobile's interest in protecting its customers from potential abuses from unauthorized

short code messaging, including spamming, viruses, offensive content, and fraudulent marketing schemes.  (*Id.* ¶ 10.)  These justifications are fatal to plaintiff's claim for tortuous interference.

## C.      The Balance of the Harms Weighs Decidedly in T-Mobile's Favor

Plaintiff is not entitled to relief for the additional reason that the balance of hardships tips decidedly in T-Mobile's favor.  *See Jackson Dairy*, 596 F.2d at 72.  As set forth above, plaintiff's claim that its "entire business will fail" is "purely speculative."  *Auto Sunroof, Inc. v. Am. Sunroof Corp.*, 639 F. Supp. 1492, 1495 (S.D.N.Y. 1986) (denying motion for preliminary injunction because plaintiff's claim that its business would collapse was based on unproven assumptions regarding the size of the market and the number of customers it required to stay in business).  Any harm from lost access to T-Mobile's customers would be readily calculable and adequately compensated with money damages should EZ Texting prevail on the merits.  By contrast, T-Mobile would suffer significant hardship if it could not enforce its short code program approval process to protect its network, customers, and brand, but was forced to provision all of plaintiff's short code campaigns, whether authorized or not.

Indeed, the Court's balance of the equities should consider EZ Texting's admitted disregard for T-Mobile's approval procedures, and its expansion of its business through shadow campaigns with the knowledge that T-Mobile had approved only one marketing campaign for its short code.  In fact, because plaintiff's website indicates that EZ Texting is certified by MMA, plaintiff is well aware that its use of shadow programs on the 313131 short code violates the MMA Best Practices, as well as T-Mobile's guidelines.  (*Id.*)  Plaintiff's blatant disregard for and violation of the MMA Best Practices and other industry standards thus weighs heavily against the issuance of a mandatory injunction in this case.

## Conclusion

For all the foregoing reasons, defendant T-Mobile respectfully requests that the Court

issue an order denying plaintiff's motion for a mandatory preliminary injunction in its entirety.

Dated:  New York, New York
          September 22, 2010

                                        SIDLEY AUSTIN LLP

                                        Alan M. Unger
                                        John J. Lavelle
                                        Corban S. Rhodes

                                        787 Seventh Avenue
                                        New York, New York 10019
                                        (212) 839-5300

                                        *Counsel for Defendant T-Mobile USA, Inc.*

23